and David Zuckerman representing the appellant and petitioner, Dwayne Woods. And I am hoping to save about 10 minutes for rebuttal in this case. Your Honor, I would like to focus on the ineffectiveness of trial counsel. And to sum it up – Keep your voice up, please. Oh, I'm sorry, Your Honor. I think I need to put the microphone a little lower than it usually is for me. I would like to focus on ineffective assistance of counsel. And, if time permits, on the related issues of Brady violations and misrepresentations by the State. Mr. Woods was represented at trial by the Spokane County Public Defender's Office, the same office this Court found ineffective in Pirtle v. Morgan. So does that mean every time they represent somebody, we should find them ineffective? I'm not sure what the relevance of that is. Well, of course I don't make such a broad statement, Your Honor. But why do you even say it at all? Because the – one of the errors that occurred in this case is identical to an error that occurred in Pirtle v. Woods. Was the lawyer the same in Pirtle as in Woods? It – there may have been some overlap at some portions of the case. Well, why don't you go on with your argument? Very good. But I don't find that to be a very persuasive one to open with. In this case, counsel freely admitted, both in the trial court and in post-conviction proceedings, that they were unqualified to handle a capital case and hopelessly overburdened. The full details of that are set out in the opening – in our opening brief at pages 11 to 14. But, counsel, I appreciate that in the abstract, each of those things sounds absolutely horrendous. But under the Strickland analysis, you have to examine, notwithstanding each of those facts, what they actually did. So it would be helpful if you would address it in the Strickland context, because in the abstract it doesn't really mean anything. Of course, Your Honor. But I think it does give some context for understanding why these errors occurred. Well, let's talk about a specific issue of ineffective assistance. If you will, please address the issue concerning the district court's finding that your IAC claim is barred with regard to the limitation on the attack on the DNA autoradiograms that were demonstrative exhibits at the trial and the district court's finding that your effort to try and expand that IAC claim to attack the underlying DNA testing itself was procedurally barred. Very well, Your Honor. The district court took a very narrow view in this case of – or a very – it took a very strict view of the exhaustion requirement. Counsel did, after all, in state court, raise the claim that defense – that trial counsel failed to effectively challenge the DNA evidence. Counsel – and to be sure, their focus was more on certain problems with the autoradiograms. Well, it doesn't – I thought that the Supreme Court told us it's a two-part test, that you have to preserve your theory, which is ineffective assistance of counsel, and you have to specify the factual basis that establishes IAC. And as I read your briefing before the Washington courts, you clearly raise the attack on the autoradiograms, but I don't see anything in the briefing that alleges the factual allegations going to the testing issues. The autoradiograms that you were fighting over are the tests that were conducted by the Washington State Patrol Crime Model, are they not? They are. Right. So that is the test. And the only argument that I see on a factual basis is whether or not those demonstrative exhibits should have gone into the jury room. So how do we get from there to where you now want to expand the argument? Certainly. And I would like to answer that question, Your Honor. Well, it's a pretty critical one, because the district court found that you didn't make it, and therefore your – I agree, and I would like to give an answer to that question, if I may. As this court has noted most recently in Pinsulter v. Ayers, there can be variation in the factual support for a claim between state court and federal court. And in fact, in Pinsulter, the petitioner presented a very different theory of mental impairment in federal court than the one he had relied on in state court. Nevertheless, this court found that the fundamental nature of the claim had not changed. In this case, counsel not only presented a challenge to trial counsel's handling of the DNA evidence, they also brought up to the Washington Supreme Court, for the most part, most of the same factual concerns that we are talking about here, the mishandling of the blood sample in the laboratory, the lies about that mishandling, and the concerns with the state's DNA expert, who had recently been fired for misconduct by the time of state post-conviction proceedings, and the fact that the lab had a practice of hiding evidence of botched tests. To be sure, the facts that we've seen... Excuse me. On that last point, were you citing to the record on it that it had a pattern of hiding? What? Your Honor, as was clearly alleged in state post-conviction proceedings, and perhaps when I come up on rebuttal, I can give you a precise answer. Sure. No, that's fine. I just... Here's what happened. By the time of state post-conviction proceedings, Dr. Brown, the same scientist who tested the DNA in Mr. Woods' case, turned out in that same year, 1997, he had botched a test in another case and hid the results of that botched testing and lied about whether there had been a prior test, and he got fired because of all of that. The... So... You're really tying the two together. Well, what I'm saying is that state post-conviction counsel were aware of that, and because of all of... they were... and they pointed out to the Washington Supreme Court, we've got all this fishy stuff going on in the Washington State Crime Patrol lab, involving the same characters who were involved in Woods, including lies about the conduct of the testing in Woods' case itself. For that reason, they realized they were not DNA experts, the state post-conviction attorneys. They asked for the assistance of a DNA expert. They asked to be able to depose all of the people involved in the state's lab. These were reasonable efforts to develop the facts, and had they been permitted to do this, all the information that we have presented in federal court would have come to light. Let me ask you a question. Let's just assume you get over... you can get over the procedural bar issues, the exhaustion. What is the relief you're seeking on this particular claim? Regarding... well, regarding ineffectiveness as to failure to present diminished capacity... No, no, no, no. I'm talking about IAC, DNA. I think we probably need an evidentiary hearing and further discovery. And what do you think you might be able to show? Well, we... in the declarations of Fred Leatherman and Dr. Donald Riley, they clearly lay out what discovery is needed here. Regarding the problems of contamination, there has never in any court been a meaningful inquiry into what really happened and why it was covered up. Let me ask you this. Let's assume the best case scenario for you. Well, the best case scenario is that we established that, in fact, Mr. Wood's... when Mr. Wood's blood spilled, there was a high... it did so under circumstances where there was a high likelihood that some molecules of his blood would have contaminated the vaginal swab. Okay. Now, doesn't that all relate to the rape? Yes, it relates to whether or not Mr. Wood's raped Jade Moore, which was a fundamental part of the aggravating factors. There were three aggravating factors, right? That is true. So let's assume the best. How does this all relate to the other aggravating factors? I'm trying to understand what you're asking for here. Actually, really, I think only two separate aggravating factors, but there were two victims. One of them had two factors and one had another. But the two essential factors was that a murder was committed in the course of a rape and committed to conceal the commission of a crime. And essentially, we don't know what crime the jury for sure believed Mr. Wood's was trying to commit, but presumably it was the rape. If, in fact, he was... if, in fact, the test would show that he was not the source of semen, that there was no... that he was not the perpetrator of the rape, that would certainly call into question the aggravating factors. It would also call into question... What was the third aggravating factor? Well, really, I believe... What was the third aggravating factor? As I was saying, there were two victims. So as I understand it, as to one victim, there was a single aggravating factor of to conceal the commission of a crime. As to the other, it was to conceal the commission of a crime and that it was committed in the course of or furtherance of a rape. My co-counsel will correct me if I'm wrong on that when I come back on the rebuttal. But it also, of course, was the most powerful evidence that the State presented regarding identification, which was the... They had other evidence, didn't they? They did, but certainly nothing... Pretty strong evidence. It was not an open-and-shut case without the DNA evidence. Venus Shaver's recollection was certainly subject to much question because she had amnesia of the events. Sherry Shaver initially did not identify Woods. It's true that... How about Jade? There were statements of hers identifying the perpetrator as a man named Dwayne. As we've argued, those should not have come in at all because they... What about the fingerprints? Well, there was testimony that Woods' fingerprints were found on certain items in that trailer, but it was undisputed that he had had a relationship with one of the victims. It wouldn't be surprising that at some point in time he might have left fingerprints. What about his attempt to use the ATM card the morning after? Well, that assumes that he was the perpetrator. Somebody used the ATM card the next day. There was no independent verification that that was Dwayne Woods who was using the ATM card. And we had his evidence of flight when the police tried to arrest him. We certainly do. We also know that this was a person who was involved in other illegal activities at the time. He was dealing drugs and was quite intoxicated on drugs around that time. I thought his statement was he was running because he had warrants for traffic offenses and that wasn't true. That is what he said, I believe, to the police, that he was running because he had warrants. Perhaps he didn't want to admit that he was running because he had been selling drugs recently or perhaps he was just mistaken. There were items of clothing that were of his clothes that were found at the crime scene. Two specifically identified by his ex-wife. I know what you're talking about. I would have to look at it again to really see how distinctive those items were. I guess all of us are getting to a common theme. Judge Pius specifically asked you what about the other two points you talked about. One, that the murder was committed in connection, attempting to conceal a commission of crime. There was another one that the jury found, and that was that more than one person was murdered and the murders were part of a common scheme, which you have not mentioned. Thank you, Your Honor. This is what the jury specifically found. Even if the rape information is gone, let's assume your very best case comes out and it turns out that the semen sample or the DNA sample was tainted and you can impeach that evidence. So the state can't show that your client raped Ms. Moore, I guess it was, right? Yes. You still have these two other factors that are death-worthy, if you will, and the jury specifically found those additional factors. So how does that help you? Well, but Your Honor, what was the common scheme or plan then? The state's case was that Mr. Woods was attempting to have sex with Venus Weber and that he then raped Ms. Jade Moore. The common scheme or plan would seem to have been a common scheme or plan to rape or convince the women to have sex with him. The Washington Supreme Court, by the way, has explained the common scheme. It's not enough simply that there are multiple murders to have a common scheme or plan. The murders must tie in with some overarching criminal design. And again, the existence of a rape would tie in that common scheme. That's one way to tie it in. It's not the only way to tie it in. There's more than one crime here, isn't there? We've got the aggravated assault, attempted murders, and murders of three different victims, all within a period or over an extended period of several hours in the same location. But the mere fact that there are multiple attacks does not mean that within Washington's law there is a common, that the murders are all part of a common scheme or plan or in furtherance of some common scheme or plan. Why couldn't the jury have reached that conclusion on the basis of this evidence? I think it's one... Don't we have to infer from the jury's verdict that they did so conclude? Well, clearly they did so conclude, but they so concluded after the State argued that this whole case, that all the murders, the State frankly argued in closing argument, this case was all about somebody saying no to Duane Woods. That was the theme of the closing argument. That all the violence was due initially to Dina Shaver saying no to sex with Woods, and then... What about the burglary robbery of their personal effect during the assault? The testimony about forcing Jade to help him go through belongings, the testimony about making one of the, telling one of the girls, I guess it was Jade, to slit the throat of one of the victims. Again, though, whether, even if such incidents took place, in other words, even if Mr. Woods did end up taking some property, that does not show that he had a common scheme or plan to commit these murders so that he could do that. So are you now attacking the sufficiency of the evidence to support the jury's verdict? I'm not, Your Honor. The Strickland standard is not the sufficiency standard. It's whether there's a reasonable likelihood that but for counsel's errors the result could have been different. And I guess what we're struggling with is there's an awful lot of very powerful evidence here to support the jury's verdict that goes way beyond the DNA evidence. I mean, you didn't mention, for example, the telephone call that was made at 2 o'clock in the morning to Woods' ex-wife. You didn't mention that there were three telephone calls to his pager before that, which would have corroborated the testimony that he was summoned to bring drugs to the house. And perhaps I should make clear, because my time is almost up, I was not intending to lead off. I have some questions for you beyond DNA. All right. Because I was not intending to lead off with the DNA issue, but rather with the failure to present evidence supporting diminished capacity. Okay. I want you to go. All right. If I may, then, perhaps I could turn to that. Because I think it's much clearer, perhaps much clearer and requires less factual development. In this case, although counsel presented an alibi defense, they also sought and obtained an instruction on voluntary intoxication. But not only did they fail to fully support that defense, they also failed, as in the Pirtle case, to offer an instruction on diminished capacity. Well, you know, Pirtle's a little bit different. It doesn't get you past back-to-home base, so to speak. Pirtle is similar. That's about it. Let me ask you a few questions about this diminished capacity. So, as I understand your intoxication, voluntary intoxication can, under Washington law, negate premeditation. Yes. Is that right? Correct. And diminished capacity can also negate premeditation, right? Correct. Now, they're actually separate defenses. Yes. They may overlap. They may overlap at some point, but they're distinct defenses, correct? Correct. Okay. Now, you're right. It seems kind of strange that they would have this – that they gave a voluntary intoxication – or asked for a voluntary intoxication instruction, and the judge gave it. Correct. Right? They also – their main defense, though, appeared, as I understand what happened here, was alibi, that he wasn't even there. That's right. Okay. So let's just take voluntary intoxication. Do you think that's inconsistent with the alibi defense? Well, first of all, I think we have two issues. One is, could they have presented both? But the second is, had they actually investigated, properly investigated voluntary intoxication and diminished capacity, should they have switched to that defense instead? And because it's quite clear that they did not investigate the mental capacity defenses before making their decision. Just keep with intoxication for a moment. Could they have presented both? Well, they could. Well, I mean, my question to you was, is voluntary intoxication, the defense of voluntary intoxication, is it inconsistent in any way with the defense that Mr. was wanted? That was an alibi defense, that he wasn't there. Not necessarily. I mean, it's not necessarily inconsistent. The defense, they could have made a – after full investigation, they could have made the decision to present both. They could have made the decision to present that perhaps – some of the defense that perhaps Mr. Wood would have wanted, which was his alibi. Now, when I read all the documents, And I read the lawyers' declarations, Mr. Fazy and Mr. – who was the other fellow? Probably Sheehan. Sheehan, Mr. Sheehan. I read their declarations in the – that were filed in the Federal District Court. They don't say anything about their decisions regarding voluntary intoxication. And the last declaration by Mr. Fazy says, one reason why we didn't investigate, now talking about diminished capacity, was because Mr. Woods maintained his innocence. I think the way he phrased it was, we didn't believe we were obligated to look into that when a client maintains his innocence. A statement which is directly contrary to the state of the law and to ABA guidelines going back to 1984. Let me ask you this. Do you think – now, you don't claim that Mr. Woods is suffering from any mental incapacity now, at least not yet. Oh, he suffers from some very severe mental problems. He has organic brain injury. That's why I'm saying this case is actually far stronger than Kirk's. Well, let me say, at the time of the trial, you didn't claim that – he didn't claim that he was mentally incompetent. Oh, no. This day in trial. No. Right. Okay. The fundamental – No, but look, here's what I want to get. So in the Federal habeas proceedings, I don't see – at least not yet. Maybe you can help me. I don't see where Mr. Woods – you know, had I been fully informed about all this mental – psychiatric stuff, how this diminished capacity defense would work or how a voluntary intoxication defense would work, you know, had they sat down and laid that out for me, I would have said, let's do it. I agree that we – There's a big – there's kind of a void here. Well, I agree that we do not have anything in the record about that. And if this court were to find that such a fact were necessary to dispose of the claim, then I think the remedy is a remand for an evidentiary hearing to explore that. But he's got an obligation to raise that claim first before the state courts and then in his Federal habeas petition. I mean, we don't just keep remanding back and forth like a ping-pong game in order to permit him to come up with new theories. And I don't know – I don't know that there was not – I don't know that in Pinsholder or in Woodford v. – or in Jennings or Douglas v. Woodford that the court had before it such a declaration. No, well, no, but we know in Pinholster – and, you know, I'm not – I'll defer to Judge Smith on that. But in Pinholster, he way – you know, he presented some mitigation evidence. But Pinholster dealt with a whole different – with kind of a different issue. It dealt with mitigation in the penalty phase of his trial. But I bring it up because we know that Mr. Pinholster objected to counsel looking into such mitigation. Just as in Douglas v. Woodford, the defendant actually objected. But there still – there still was a mitigation defense proffered in Pinholster, right? I'm trying to remember at the trial court level exactly what was presented in that case. Well, the mother testified at the trial about the way that he'd been abused by the father and so on. That evidence was before the judge. But my recollection was that they did not present, however, evidence of the defendant's mental problems. And the defendant had objected to – you know, he told them he didn't want them to do that. In the penalty phase, although there was testimony by the mother again that he'd been run over by a car and that sort of thing. Can you answer a question for me, though? You maintain that there is this obligation to investigate all these different defenses. How do you square that with the language of the Supreme Court in Knowles, where they said that this court has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success? Oh, well, I don't disagree with that statement. I mean, if counsel has done reasonable investigation and has determined that a certain claim would be frivolous or would be useless, they don't need to pursue that. Here, in this case, the penalty phase lawyer actually had a psychological report in his hand showing that Woods had some very serious mental problems. Well, as I understand your argument, it's – okay, they had some information in front of them, the two lawyers. Well, the penalty phase lawyer did. Well, don't tell me they – you're not going to stand there and tell me they never talked to one another. We don't – well, we don't have – You said there was a straight face and tell me these two lawyers never talked to one another. I don't – we don't have a record one way or another. Here's what we do have a record of. You're standing there and telling me they never talked to one another. I am not. We do have a clear record, however, that the expert who spoke with the penalty phase lawyer never spoke with the guilt phase lawyer and was never asked to explore the issue of diminished capacity. And was never given sufficient information. Let me ask you this. Did they have any other information other – that he had a history? Let's just talk about the guilt phase lawyer, then, if that's what you want to focus on. Was there any – was he aware of any information that Mr. Woods had a history of cocaine abuse? We – well, certainly he had – it came up at trial that Mr. Woods was involved in the drug scene. He had that information, right? He did. Now, in state post-conviction, counsel fleshed out much more detail about that. And these were witnesses that counsel could have – trial counsel could have looked at it. I think what really – just kind of a spin from – a spinoff from Judge Tolman's question. But they knew – I think you have to acknowledge that they had some information that Mr. Woods had a serious drug problem. And I'm – yeah. And that's why they offered the voluntary intoxication instruction. Right. Well, there was evidence, as Judge Tolman pointed out earlier, about the fingerprints on the vodka bottle. Obviously, there had been some consuming of alcohol, and there had been some information that they had been drinking the night before. So it makes sense that they would ask for a voluntary intoxication instruction, see whatever they could get at – what mileage they could get out of it. But – so I'm still trying to understand, for purposes of the diminished capacity claim now that you're raising, is – and following up on Judge Tolman's question, is – so these lawyers have this choice to make. And it's very difficult. And I – you know, I appreciate the dilemma that lawyers have at times. And they may have thought that there might have been a pretty good diminished capacity argument they could muster. But to do that, they would have to – they would have had to acknowledge that he committed the murders, especially for diminished capacity. And when you read this, you get the impression – and you can correct me if I'm wrong, please do if you can – that Mr. Woods didn't want to admit he wanted to maintain his innocence with respect to these killings. Is that right? Certainly, Mr. Woods was making statements that he was innocent. He did a lot more than that. So what – so taking Judge Tolman's – I mean, they had some information. So your – so your – is it your argument that they should have investigated, and maybe they should have, that they then should have insisted on going forward with the diminished capacity defense, irrespective of what Mr. Woods wanted? So that's the dilemma that I'm having. One, we don't know they would have reached that dilemma. As the Court said in Woodford – in Douglas v. Woodford and in Pinsulter, you first have to do the investigation. You first have to find out what defenses you have. Then you can have a meaningful consultation with your client and discuss his options. So then, just to follow up on that point, my earlier question was, okay, assuming they had done all their investigation, they had a meaningful conversation with him, and he said, yeah, had I known all of that, I would have said, let's go for diminished capacity. But I don't – this record, which has been – you know, which you guys have been developing for years, I don't get that sense that that's what he would have done. Well, we have not had an evidentiary hearing in any court yet, so the record is not complete. There's nothing to stop you from filing an affidavit. And perhaps we should do that, Your Honor. Clearly, Mr. Woods has been quite frank about issues he's not allowing us to bring up to this Court. He has not prevented us from bringing up this issue. It's similar to what happened in the – now, you're habeas counsel. You know, you're a post-conviction counsel. You're not – you know, you're in a different kind of role. But, you know, isn't it kind of similar to what happened below? Well, at this level, Mr. Woods has made it clear that we may not raise claims relating to the penalty phase. He has not objected to our raising the diminished capacity issue. I guess the problem, though, I'm having is that the Washington Supreme Court specifically found that there was a reasonable tactical call that trial counsel made when faced with the tough choice of either my guy was there and he did it, and here's my diminished capacity defense, or somebody else did it, and I'm going to rely on the alibi defense. And if that's a reasonable decision under Strickland, then applying the deferential lens of AEDPA, how can we declare that state court determination to be unreasonable, particularly in the face of the Supreme Court's language in Knowles? Because defense – because Strickland itself says that you give defense to defense counsel with their strategic decisions only after they have made a reasonable investigation into their options. Counsel admits that they did not look into a diminished capacity defense. You still have the problem, and I think we're all wrestling with this issue. You still have the problem that even if you had – even if they'd done a complete investigation and found just devastatingly wonderful evidence for Mr. Woods on the diminished capacity issue, if he insists, ultimately, I forbid you to put me at that scene, which they would have to do if they were using the diminished capacity defense. I wasn't there. I'm innocent. I absolutely maintain this to the end. And he's continuing to do that. He'd rather die than admit that something – that there was something diminished or wrong here. At what point does the counsel have little choice? It seems to me that while we were writing Penholster, the Supreme Court came down with two cases that we talk about in the opinion that made it clear that a strategic decision trumps all of this. And what I'm wrestling with here is how this could be other than a strategic decision, even assuming – let's just take it as a given that an inadequate investigation was done under the ABA standard. So just take that, but let's assume you then have a client that says, no way, no way, I wasn't there, I didn't do it, I forbid you to present this. What's the lawyer going to do? And I have two answers for that, Your Honor. One, the lawyer makes – as long as the lawyer is representing the client, the lawyer makes the strategic decisions at trial, not the client. The lawyer is the one who gets to decide what defense – And I understand that. I understand that. But if you're the lawyer and you make that decision and your client is recalcitrant and does everything he can to sabotage that, have you really effectively represented the client? We don't know that he would have sabotaged it. Nobody knows anything. You still have to think as a lawyer and wonder what the impact is going to be. Mr. Woods didn't testify at trial in any event. He did cooperate with a psychological evaluation prior to trial. I have – but there's a second option here. It is not – it would have been possible to present both defenses. It is not necessarily inconsistent to say they got the wrong guy. But we also want the jury to know that Mr. Woods could not have committed a premeditated murder on that night because his brain was incapable of premeditating. And here's all the reasons why we know that. Nothing prevents the defendant from presenting alternative defenses at a trial. Realistically, if you're going to argue diminished capacity or make an issue out of involuntary intoxication, you're really undermining the alibi defense. Particularly when you add to that the long list of evidence that Judge Tallman marshaled earlier that put your client at the scene and fleeing afterwards using the credit cards, et cetera, et cetera, et cetera. Raising a diminished capacity defense probably would have been an irrevocable nail in the coffin of your client. You can't really realistically just likely say, well, you could present these two different theories. Realistically, before a jury, it would have been the end. And so under the circumstances, how can we second guess what the lawyers should have done in hindsight when it appears that they made a strategic decision based upon these things we just talked about coupled with the fact that their client insisted that he was innocent? Well, actually, I think the points Judge Tallman was making, that in his view the evidence of I.D. was overwhelming, would tend to show that it would have been, if true, would tend to show it would have been unreasonable to go with a defense of identification rather than diminished capacity. Except, counsel, that you've got a crime, just a savage, brutal, continuing crime committed over the course of several hours. This is not a diminished capacity defense where someone just flies off the handle and in a five-minute crime spree kills three people or two people and tries to kill a third. This was a crime that was, you know, evidenced a substantial amount of premeditation and careful thinking in making the victim, one of the victims, stand and look out the window while he's doing something to one of the other victims. I mean, the jury hearing that is going to have a very difficult time buying your diminished capacity theory that this guy had no understanding of what he was doing. Actually, to the contrary, Your Honor, I think that the facts of this case strongly suggest that there was not premeditation. Telling one of the victims to accompany him to split the throat of another victim, I mean, it raises sadism to a level that I can't comprehend. I believe the strongest statement, the strongest explanation is at ER 440-41. This is in the Declaration of Dr. Lezak, where she specifically discusses the reasons why the facts of the case do not tend to show that. Mr. Woods, unlike in Pirtle, for example, Mr. Woods did not – was invited to the house. He did not show up with a weapon. By all accounts, did not show up with any plans for violence. There are bizarre facts in which at some times he's being sociable, and then there are sudden outbursts of violence. It's true that according to the testimony of Jade, or at least this goes on for a long period, long periods in which there – between which there was no violence, and then these sudden bursts. Further, as Dr. Lezak points out – How do we know that? I mean, how do we know that, for example, that the rape wasn't perpetrated over a long period of time by a victim who had either been beaten half to death and was incapable of resisting or who was restrained in some fashion and was unable to resist? Well, I don't know that we can know every detail. But one critical point, I think, is that if there was this premeditated intent to kill, then why did he do such a poor job of it? Two of the victims were left alive. There were numerous weapons available there in the house. Not because he didn't try to stab them and beat them multiple times. Had there been one blow, perhaps, but my goodness. There were strong outbursts of violence, to be sure, with things that were there in the house. But if there's a premeditated intent to kill and rational thinking going on, you would think that by the end of those three hours you would make sure you had killed. Well, I guess what we have to assess for purposes of the prejudice analysis is whether a jury would have been so persuaded by Dr. Lezak's testimony, as you appear in the declaration, that there's a reasonable likelihood that the result would have been different. I'm just having a hard time getting there based on the facts of this record. Well, again, I would encourage the Court to review her declaration. And ultimately the question is, is there a reasonable likelihood that had the jury heard from Dr. Lezak and her explanation of how Woods' actions were consistent with temporal lobe problems and explosive discontrol, is there a reasonable likelihood that the jury would have had a reasonable doubt? And acquitted him. I mean, this is not a penalty phase argument we're talking about. You're not arguing about the difference between death and life imprisonment without parole or life for a specified term. The question is, would they have found him not guilty? Well, we don't know that because... But that's the question we have to answer, is it not? Well, they could have found him that he didn't have premeditation for first-degree murder. Exactly. Presumably. If the defense had presented a meaningful diminished capacity defense, probably the prosecutor would then have, if not the defense, would have said, well, we think we better offer some lesser-included instructions here. Right. They were instructed on felony murder? Felony murder was never alleged here, but a lesser-included of premeditated murder is intentional murder in Washington, which is second degree. And even without intent, you would have a manslaughter conviction. And they might not have found aggravators, I guess, would also be part of your argument. Certainly. All right. We've been very generous here. I thank you. And we'll hear from the State now. And we'll be just accommodating to the State. May it please the Court. I'm John Sampson, Assistant Attorney General representing the Respondent, and I will address the issues that were just addressed by Petitioner's counsel, starting with the diminished capacity defense issue. And in approaching this issue, it is important to keep in mind that this case falls under ADPA, and the Court owes deference to the State court decision. And the issue is not whether counsel was ineffective. The primary issue is whether the State court's adjudication was objectively unreasonable. An unreasonable application of strickly. Yes, Your Honor. And as this Court found in Bean v. Calderon, and that case also cited Turk v. White, counsel can reasonably choose to pursue an alibi defense rather than another defense, such as diminished capacity, when the defendant insists that he was not involved in the murders. That's the same holding that the State Supreme Court reached in this case. So the State Supreme Court reached the same decision that this Court has reached in at least two, if not three, cases. Now, let me ask you this. The problem is, when you look at the potential for a diminished capacity defense, it looks pretty strong. I mean, he was a serious cocaine abuser, had a history of cocaine abuse, brought cocaine, and there's no question. He had a serious problem. He had some brain, what was it, some brain injury. I believe. Organic damage to his brain. I don't know if it was all brought on by the drugs. There was something there for a diminished capacity defense. There could be a diminished. Now, you know, it looks like the reasonably prudent counsel would have thoroughly investigated that defense. You wanted to? Sat down with their client and said, hmm, here's what we've got. Here's what we can do. We need you to take this defense. We're going to have to do this, this, and this. We'll do this defense. We're going to have to do this, this, and this. You know, you think they needed to thoroughly investigate before they decided which route to take? The Supreme Court has not held that counsel must thoroughly investigate a diminished capacity defense before electing to pursue an alibi defense. And this Court has actually held that counsel can choose not to investigate a diminished capacity defense before presenting an alibi defense when the defendant insists he was not involved in the crime. The State Court's decision was not an unreasonable application of Supreme Court precedent. Do you think it makes a difference here that he doesn't, in the habeas proceedings, that he doesn't offer, you know, had I known? No, Your Honor, because in the habeas proceeding, if he were to prevail on this claim, it would vacate his convictions. And the State would have to retry him, and he could again present a defense. At trial, at best, it would result in a lesser conviction, which would still constitute a third strike, and he would be sentenced to life without parole, which is a sentence he has always said he does not want. He has always said, and in fact he threatened to dismiss this habeas proceeding just before the district court ruled because he didn't like how long it was taking. He has repeatedly stated he does not want life without parole. That's what he would have gotten with a diminished capacity defense. And so, no, there is evidence that he would not agree to such a defense. I see. So, you know, the declaration by Mr. Stasi that's filed in the habeas, Federal habeas proceeding, I think it's maybe filed in the personal restraint proceeding. It's very short. It is very short, Your Honor. When you're in the habeas proceedings, there is a waiver of the attorney-client privilege that you're keeping the attorney being ineffective on this particular claim. Yes, Your Honor. And if this case were to go to an evidentiary hearing, we would certainly depose Mr. Fazi and Mr. Sheehan and the other counsel. But the district court correctly denied this claim without an evidentiary hearing. Under Landrigan versus — or Sherrill versus Landrigan, the district court, even assuming 2254E1 didn't bar an evidentiary hearing, the district court properly exercised its discretion because the State court adjudication of this claim is not unreasonable. Now, there was another sort of mental defense here, which was, and I say sort of, because at some point along the way, counsel just — and I don't know quite how they do jury instructions in the Washington State courts in Spokane and how they were doing them. This judge was doing them in 19 — what was the trial? Ninety-six. Ninety-seven was the trial. Now, practice usually is when you get to — and hear all the evidence at the end, you do a jury settlement conference and you decide what sort of instructions you're going to give. At some point, counsel must have asked for this voluntary intoxication instructions, correct? Yes, Your Honor. Based on the testimony of Venus Shaver and another witness that Mr. Woods had been drinking that night, the defense asked for that instruction. The judge granted that instruction. It was given. Defense counsel never argued that instruction. All right. Now, what was that all about? That is similar to an attorney asking for lesser-included instructions, even though they don't ask or argue to the jury that they should convict them of the lesser-included offense. Counsel will often, when the evidence reports it, ask the court to give instructions that they may not necessarily argue because, in fact, there would be a claim of ineffective assistance if they didn't ask for such instructions. And counsel didn't present a defense of voluntary intoxication. But counsel did act reasonably in getting an instruction on that issue because there was evidence to support that issue. The state court's decision that counsel pursuing an alibi defense and not a voluntary intoxication or diminished capacity defense was not objectively unreasonable. Is the voluntary intoxication defense inconsistent in any way with an alibi defense? Counsel just argued that, you know, you can have alternative defenses. And if you don't believe this, you know, here's what we got this. One of the roles of a trial attorney in a jury trial is to gain the trust of the jury and to gain or to preserve integrity with the jury. And if an attorney says, my client didn't do it, but if he did do it, he didn't know what he was doing, there's a risk that you're going to lose integrity before the jury. You're going to lose the trust of the jury. So it's reasonable for counsel not to present those. What this court has recognized can be inconsistent defenses. In Vena v. Calderon, this court recognized alibi and diminished capacity are inconsistent defenses. And it's not unreasonable for an attorney to choose one and not the other. Mr. Sampson, besides the testimony of the bartender that he was actually drinking in the downtown Spokane bar the night of the murder, what other evidence did Mr. Woods offer in support of his alibi defense? That was the primary. The other was a cross-examination, Your Honor. To try and shake the eyewitness identification. Yes, Your Honor. To attack the credibility and the ability. In fact, they did present an expert, Dr. Loftus, who testified on the trouble with eyewitness identification. And the counsel vigorously pointed out the fact that Vena Shaver did have memory loss. They pointed out that Mrs. Sherry Shaver originally misidentified Woods in a fuller montage. They tried to attack the DNA evidence on cross-examination. And the attorney was a very experienced capital punishment defense attorney who did cross-examine Mr. Brown. Let's turn for a moment to the DNA ineffective assistance of counsel. Yes, Your Honor. Could I ask just a threshold question on the same point that Judge Pai has raised? One element of this that seems to me has not been properly tied up has to do with the procedural barring of Mr. Woods to challenge the DNA evidence. So just deal with me with a hypothetical for a minute, and then I'd like your thought on what you think it yields. Let's just assume, for purposes of our discussion, that enough evidence has been presented in the state court to satisfy Lopez v. Shiro, Davis v. Silva, and to some extent Penholter v. Ayers. And let's assume that because of that, we would normally find that Mr. Woods has a right to go back to the district court on the issue that was raised, which is the allegedly tainted DNA. Were we to come to that conclusion, are we permitted under the case law, the Supreme Court case law, to find that because there were two other grounds for capital result, that essentially Strickland can't be satisfied, which is the ultimate result they're looking for here, and therefore we don't need to grant a hearing even though it wasn't procedurally barred? What's your thought on that? My answer is yes, Your Honor. Yes, what? Yes, this court could deny relief because of that fact, and that would go not only to the ineffective assistance claim, but also to the Brady claim, the allegation that the state suppressed evidence regarding possible contamination, because the prejudice prong is the same for both Strickland and Brady. And as this court had questions for opposing counsel, there were other aggravating factors. These are excerpts of record 801 and 803. One is that there were multiple murders committed in the common scheme of plan, and the other is that it was committed to conceal the commission of a crime. As to that factor, under Washington law, the jury doesn't have to agree and the prosecutor doesn't have to prove the specific crime he was trying to conceal. It's a crime, and there were multiple crimes. There was the assault on Vena Shaver. There was the murder of Talisha Shaver. There was the robbery, which they have not shown any reason to doubt those robberies occurred. There was the rape, which the DNA evidence would only go to the rape, but even if you got rid of the DNA evidence, and really their argument is not that he wasn't, that it wasn't his DNA evidence and that it was somebody else's. The argument is that it's at best inconclusive. And that's really, I guess, my point. So from your perspective, we can apply Brady prejudice, Strickland prejudice, in terms of our analysis of whether, even though it may not be procedurally barred, whether we have to send it back on this sole issue of the DNA taint and so on, because even if they prove it, it doesn't get you anywhere. Is that correct? That's correct, Your Honor. And as to the rape, there was the statements Jade Moore made that she had been raped by Mr. Woods. So even if the jury disregarded the DNA evidence, there was still other evidence as to that rape. But even if the jury said there wasn't a rape, there were sufficient other crimes. And the corroboration of the rape, I take it, would come from the rape examination at Deaconess Hospital by the treating doctor and the ER nurse. Yes, Your Honor. So let's just take Judge Smith's question and step back just a little bit further, which is, so the district court held that the IAC's part of the DNA claim was procedural, was unexhausted, essentially, and also procedurally. Ultimately, Washington's law is procedurally barred at this point. Yes, Your Honor. So, you know, was it on the district court correct? Yes, Your Honor. Why? The reason they were correct is that the claim that Mr. Woods on ineffective assistance to counsel and even on the Brady claim, on the ineffective assistance counsel first, the claim that he presented regarding DNA was solely the failure to send the autoradiograms to the jury during deliberations. And the personal restraint petition at, this would be ER 975 to 991, there was only discussion as to the DNA going to the autoradiograms and whether they should go to the jury. And Mr. Woods relies heavily on the fact that he asked the state court to appoint a DNA expert. Right. With that motion, excerpts of record 2364 to 2369, was solely so the DNA expert could advise them on whether the autoradiograms should have gone to the jury. It was not the reason. Didn't they have another motion as well besides that one? That was the only one as to that expert. There was one for an attorney expert to talk about counsel's failure to challenge the autoradiograms. And I think also regarding the diminished capacity. That was a declaration of Mark Vogel's. But there was only one DNA motion, or one motion for a DNA expert by the defense in the PRP proceeding. And that was for the purposes of the expert advising on the autoradiograms. They never mentioned potential contamination. They never mentioned misconduct that led to contamination in that motion. And the declarations of Mr. Leatherman that were presented to the state court. And there were new declarations presented in the federal court. But in the state court, the declaration of Mr. Leatherman, excerpts of record 885 to 889, and 1318 to 1321, also went to Dr. Brown's conduct in Barfield, and then the autoradiograms. Nothing about contamination. In the amended personal restraint petition, which you just pointed to, 975, 976, 977. I don't know, I guess 978. You know, the allegations, I mean, they talk about the motions and their efforts to get some expenses to pursue these items that they refer to in their petition. And it was denied. But that went to the allegation of Dr. Brown's conduct in the Barfield case, the ineffective assistance counsel of diminished capacity, and the failure to- Well, the claim, as I understand it, the claim was that we learned afterwards that he had a practice of taking, you know, preliminary tests and then just looking at the results. And then the claim in the Barfield case was that he destroyed the first test. And then they did another test. And so I gather what they were concerned with was that in Mr. Wood's case he had possibly done the same thing, and there were all these strange things that they allude to about the difficulty with the storage of some of these specimens. Yes, Your Honor. In the Barfield issue, Dr. Brown's conduct in Barfield was presented to the state court, and the district court denied that claim on the merits. But the Barfield was limited to Dr. Brown's untruthfulness in the Barfield case, which was several years after this trial here. And the investigation is to Dr. Brown's conduct and his firing. There was nothing in that claim involving contamination. There is nothing in that claim involving defense counsel's failure to call a defense DNA expert. Those claims were never presented to the state court at all in the PRP proceeding. He had a related Brady claim. Yes, Your Honor. And that claim also was never presented to the state supreme court in the personal restraint petition proceeding. And the Brady claim that were presented to the state court were the two that were addressed by the district court on the merits, the Barfield issue and then an issue that's not raised before this court regarding a witness. There was never any mention in the state court about contamination or failure to call a DNA expert. And although Mr. Woods relies on pinholster, that claim in pinholster was the same claim in state and federal court. It was the evidence supporting that claim that had been modified from state to federal court. Well, as I understand, you know, at least with respect to the ineffective assistance of counsel claims, IAC claims, his claim is that he starts out with the broad challenge that these guys were basically inexperienced death penalty, death capital defense lawyers. They were just inexperienced. They didn't know what they were doing. And they didn't know in particular with respect to DNA. They didn't understand it. And in fact, one of the lawyers submitted a declaration saying that he had, it just was beyond him. So they brought in, they got approval and authority and money to bring in the expert, right? Yes, sir. And the expert came in and cross-examined the state, Dr. Brown, as I understand it. And they made some allegations with respect to the Leatherman, I guess with respect to Mr. Leatherman. And he had to fly in and fly out and they didn't get a chance to really confer with him and whatnot. But putting all that aside, so they go on and they claim, well, you know, had we, there had been some expression about problems with the one blood specimen sample that had been frozen and unfrozen. It had cracked when it thawed and spilled and there's possibility of contamination. And we weren't told about that. We weren't told about the risk of contamination. We weren't told. And had we been, had we learned all of that at a much earlier time, there's things we could have done, we would have done. That's the allegation now. But isn't that what they were also arguing in the personal restraint petition basically? And then here they get to us and they sort of refine it a bit. They say, well, we would have called an expert witness. You know, they should have called an expert witness to rebut the DNA evidence. They should have had their own DNA expert. And two, what was the other one? It would have been a better cross-examination or something. I can't remember exactly what it is. The issue of potential contamination, even regarding the first blood spill, was never presented to the state court. The first blood spillage issue, the misrepresentation claim, the uncertified claim, that was presented to the state court as if the state had told us in August rather than in October of 1996 that the real reason why the DNA testing had not yet occurred, the trial court wouldn't have granted the continuance. And the state Supreme Court reviewed that. There was never an allegation in the personal restraint petition that that misrepresentation regarding the first blood sample created an issue of contamination. That claim only came once the federal habeas corpus petition was filed. And for that reason, the district court correctly determined that the claims that are now barred were never presented to the state court. And, in fact, the district court recognized that Mr. Woods was essentially conceding he had never presented them to the state court. Excerpts from records 205 to 209, the district court reviewing Mr. Woods' pleadings said he's conceding he never presented this issue to the court. He's just saying this is a new evidence. But it's not new evidence. It's an entirely new claim that was never exhausted and is now barred. Well, if you just take, you know, the one claim that counsel were ineffective because they didn't retain an expert, their own DNA expert, doesn't that flow from the allegations that they were making? No, Your Honor, because the allegations they were making were really going to the ability to impeach Dr. Brown's testimony, not a separate allegation. So that's what their own expert could have if their own testimony impeached Dr. Brown's. And the defense did get a DNA expert in the trial court. They had the evidence reviewed by a DNA expert. They never called that DNA expert, and they never disclosed the results of that DNA. Who was that? It was a California expert, is my understanding. That wasn't Mr. Leatherman. The record, I'm not sure if it's in the excerpt of the record, but it's in the trial in the state court record that was before the district court, and it was in volume 12 of the record, pages 5350 to 5351, 5366 and 5408. There's discussion in there about how the defense obtained the DNA results and sent it for evaluation by their own experts. So they did have a DNA expert in the trial court. The claim presented to the Washington Supreme Court on collateral review was not that counsel should have called that DNA expert or another DNA expert. The claim was that was related solely to Dr. Brown's conduct in the Barfield case and the so-called policy of destroying evidence. And addressing that issue, there's simply no evidence that any records were destroyed in Mr. Wood's case. So even though Dr. Brown committed misconduct years later in a Barfield case, that doesn't mean that the misconduct occurred here. There is no evidence of that. In fact, the testimony or the evidence of Don McLaren was that he was the one who conducted the peer review. He agreed with Dr. Brown's results in Mr. Wood's case. So there's simply no evidence of any suppressed destruction of evidence in this particular case. Okay. And just finally, Your Honors, getting back to the diminished capacity and also to the prejudice issue. Counsel argued how he had a strong diminished capacity defense. And I would submit that based on the facts of this case, it simply does not exist. Mr. Woods attacked Venus Shaver. He beat her and he stabbed her. He then took Jade to see Venus and said, if you don't do what I want and don't cooperate, you're going to end up like this. He then acted purposely to commit a robbery, to take her ATM card, to get her PIN number. He raped her. He then, when Talisa Shaver showed up, bound her, attacked her, and took Jade over to Talisa and said, if you don't slit her throat, I'm going to kill you. At that point, Jade Moore knew she was going to die. She knew Mr. Woods had formed the intent to kill. And, in fact, any jury listening to that evidence, even if they had an expert's opinion saying, oh, Mr. Woods couldn't form intent based on my expert opinion, the jury would have said he knew what he was doing. He committed the crimes with premeditated intent. And counsel argued that there was no rationality. Well, premeditation does not require rationality. It just requires premeditation of the intent to kill. We would ask that the Court affirm the district court's judgment in this case. A few minutes for rebuttal, but we gave you plenty of time on the first building. I appreciate that, Your Honor. Your Honor, just in regard to Mr. Sampson's last point, in this case, the evidence for premeditation was considerably less than it was in PIRTL. In PIRTL, the defendant took a weapon with him to the scene of the crime. He tied up the victims and then one by one killed them. The attack was much more elaborate and lethal in PIRTL. He left absolutely no doubt before he left that the victims were dead. And during the course of it, he had the presence of mind to tell a patron who came to the restaurant where the murder took place that it was closed. He also made considerable efforts to cover up the crime. Nevertheless, this Court properly found that there was strong expert testimony that the defendant was suffering from explosive discontrol and temporal lobe seizures and that the jury could well have come to a different result otherwise. In this case, we have no preexisting plan. He shows up without a weapon. He acts with considerable violence, but without any – but with doing a very poor job to kill. And there are sudden irrational changes from peaceful to violent behavior. Further – I mean – Counsel, I'm still having a hard time given the number of blows that were struck, both bludgeon-type blows and stabbing-type blows, and your statement that he wasn't doing a very good job of it. I mean, I'm not quite sure how we weigh that other than it's a really savage attack, and it went on for a long period of time. I don't know if it's a testament to the resiliency of relatively young victims who are otherwise in good health and who would better withstand that kind of attack, but I don't see how it helps your diminished capacity. Well, clearly he isn't stabbing and beating for three hours nonstop. There are periods of explosive violence. Nevertheless, he leaves at least two of the victims alive at the time he finally leaves, hours later. But we don't know whether he knew they were alive, and we don't know the condition in which they were at when he departed the crime scene, do we? We can't be sure of that. We don't know whether they were conscious at that point, I guess is what I'm asking. Right. We don't know whether they were conscious. Certainly we know that one of them was conscious and walking around, well, very shortly after. If you accept the testimony of Sherry Shaver, I mean, very shortly after Woods left, or almost at the same time that he left, if you accept her testimony. You may very well explain why he didn't finish the job, because the mother arrived while he was about to administer the coup de grace. But, again, I mean, he would have had ... There was no question he's there for a long time. He would have had ample opportunity earlier than that if that was a goal, any sort of plan or goal in his mind to accomplish. Thank you. Yes. Thank you. I'll just let him finish answering Judge Tolman's question. Thank you. Thank you, counsel. We appreciate your arguments, and this matter will be submitted at this time. And that ends our session for today.
judges: Paez, Tallman, Smith M.